FRONTIER RESEARCH INCORPORATED *vs.* COMMISSIONER OF
PUBLIC SAFETY & others.

Middlesex.    October 7, 1966. — January 20, 1967.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK,
SPIEGEL, & REARDON, JJ.

*Fire Prevention. Flammable Substance. Public Safety. Equity Juris-
diction,* Declaratory relief. *Equity Pleading and Practice,* Decree, De-
claratory proceeding.

A manufacturer of certain highly flammable substances was entitled to
    maintain a suit in equity for declaratory relief against the appropriate
    fire prevention officials to determine whether its business was subject to
    G. L. c. 148, §§ 9, 10, and 13, and to regulations made by the Board of
    Fire Prevention Regulations under §§ 9 and 10, where it appeared that
    following a fire on the plaintiff's premises and an investigation by a
    chemist of the Department of Public Safety he filed two separate official
    reports several months apart which were somewhat conflicting and am-
    biguous and had an uncertain application to and effect on the plaintiff's
    business and rendered uncertain its appropriate course of action, and
    that no event had occurred which required the plaintiff to appeal to the
    State Fire Marshal under § 31.    [618–619]
Evidence in a suit in equity for declaratory relief did not warrant a find-
    ing that certain highly flammable substances manufactured by the plain-
    tiff were covered by any current regulations made by the Board of Fire
    Prevention Regulations.    [619–620]
Under G. L. c. 148, § 10A, providing for the issuance of permits by the
    head of the local fire department where made necessary "by rules and
    regulations" of the Board of Fire Prevention Regulations, no permit
    thereunder was required for use of a substance not covered by any rule
    or regulation of the board.    [620]
In a suit in equity for declaratory relief by a manufacturer of certain
    highly flammable substances, this court ordered entry of a final decree
    that such substances were not covered by the then regulations promul-
    gated by the Board of Fire Prevention Regulations under G. L. c. 148,
    §§ 9, 10, but that if the board should amend its regulations within a
    specified period to include such substances, and should promptly trans-
    mit a copy of the amended regulations to the plaintiff with a ruling that
    they so applied, then the plaintiff would be required to seek a per-
    mit under § 10A from the head of the local fire department before re-
    suming operations, unless the plaintiff should obtain reversal of the
    ruling by a seasonable appeal to the State Fire Marshal under § 31;
    and that, in the absence of an effective amendment within the specified
    period, the plaintiff might resume operations upon obtaining a license
    under § 13 from the local licensing authority only.    [620–621]

BILL IN EQUITY filed in the Superior Court on June 20, 1963.

The suit was heard by *Beaudreau, J.*

*Peter J. Coulouras* for the plaintiff.

*Samuel W. Gaffer,* Assistant Attorney General, for the Commissioner of Public Safety & another.

REARDON, J.   Frontier Research Incorporated (Frontier) brings this bill for declaratory relief against the State Commissioner of Public Safety, the State Fire Marshal, the town of Chelmsford, and its treasurer.   Chelmsford's fire chief and its selectmen are not parties.   It alleges that principally because of differing reports made by an assistant chemist attached to the Department of Public Safety (the department), Frontier is uncertain with respect to its rights and duties under G. L. c. 148, §§ 9, 10, and 13, and the regulations thereunder.   The bill seeks a declaration that Frontier's business is subject neither to those sections of c. 148 nor to regulations made under §§ 9 and 10.

Frontier's bill was dismissed on the grounds that (a) it had not seasonably taken an appeal under c. 148, § 31; (b) a declaratory decree would not settle the controversy between Frontier on the one hand and Chelmsford's fire chief and board of selectmen on the other; and (c) the materials "kept and manufactured by . . . [Frontier] on its premises are articles referred to and subject to regulations . . . promulgated under" G. L. c. 148, §§ 9 and 10.   The evidence is reported.   The trial judge justifiably found the following facts among others.

Frontier "was engaged principally in the manufacture of dinitrosopentamethylenetetramine . . . [DNPT], and the mixing of that material with silica to form a chemical blowing agent called Isopor."   On April 5, 1961, a fire occurred on Frontier's premises in Chelmsford.   It was investigated by Dr. Hankard, an assistant chemist employed by the department.   On June 6, 1961, and on September 20, 1961, he filed separate official reports on the fire.

In the earlier report he concluded that the fire preceded an explosion, which was "due to the extremely rapid evolu-

tion of a large volume of gas from approximately nine tons of Isopor as the result of fire exposure," and that the spontaneous ignition of floor sweepings contaminated with DNPT was a possible cause of the fire. He identified DNPT as a Class B explosive under the regulations of the department governing explosives, but stated that Isopor was not to be classified as an "explosive or 'flammable solid'" and was not subject to the regulations of the department.

In his second report, Dr. Hankard retracted his previous classification of DNPT and found it to have "negligible explosive properties under test conditions." He stated, however, that DNPT "and Isopor are highly flammable materials which will ignite and generate gases to a dangerous extent when acted upon by acids and acidic salts and open flames or sparks." He therefore classified them as hazardous substances subject to regulation under c. 148, §§ 9 and 13.

It is apparent from the findings of the trial judge that the local authorities have advised Frontier that it must comply with the licensing requirements of c. 148 if it is to resume its manufacturing business. Frontier denies that it is subject to such regulation but states its doubt and the possibility that continuing the business may render it liable to the penal provisions of c. 148.

1. Frontier may maintain this bill for declaratory relief. *Madden* v. *State Tax Commn.* 333 Mass. 734, 736–737. See *St. Luke's Hosp.* v. *Labor Relations Commn.* 320 Mass. 467, 470–471. There was no definitive action, at any specific time, by the department, Dr. Hankard, or others in connection with either report, nor was there specific official communication to Frontier of any report or action of Dr. Hankard or others. We assume that, at least with the consent of the Fire Marshal, Frontier could have taken some type of appeal[1] to the Fire Marshal from each report within

---

[1] General Laws c. 148, § 31, provides for appeals within ten days to the Fire Marshal by "[a]ny person aggrieved by any act, rule, order or decision" of any person, with one exception not here relevant, acting under c. 148.

ten days after that report was filed, if it had learned of the report officially.   The effect and intended application, however, of the two somewhat conflicting reports remained, and still remain, ambiguous and uncertain.   No official departmental action on the basis of either report has been shown to have been taken or proposed.   No amendment of regulations under G. L. c. 148, §§ 9 and 10, has been issued or suggested.   We think that no event occurred sufficient to require appeal action within ten days thereafter, or, in the absence of an appeal, to preclude later declaratory relief. Cf. *Goldman* v. *Planning Bd. of Burlington,* 347 Mass. 320, 326.   We think that the uncertainties (a) caused by the reports and their effect upon Frontier's business and (b) concerning the action appropriate for Frontier to take in the circumstances were sufficient to justify declaratory relief on a basis analogous to that underlying the *Madden* case.   See *Metropolitan Dist. Police Relief Assn. Inc.* v. *Commissioner of Ins.* 347 Mass. 686, 689.

2.   The trial judge incorrectly concluded that the department's present regulations under c. 148, §§ 9 and 10, govern DNPT and Isopor.   As highly flammable substances, if Dr. Hankard's appraisal of them is correct, these materials might have been subjected to regulation.[2]   There was no evidence which would have made these substances subject to regulation as "flammable solids" under Fire Prevention Regulation 13, nor was there any evidence to justify their classification under Fire Prevention Regulation 12 in Class A (dangerous explosives) or in Class C (minimum hazards).   Even if they might have been listed in Class B as flammable hazards, they were not so listed by regulation

---

[2] Chapter 148, § 9, provides: "The . . . [Board of Fire Prevention Regulations (board)] shall make rules and regulations for the keeping, storage, use, manufacture, sale, handling, transportation or other disposition of gunpowder, dynamite . . . or any other explosives, fireworks, firecrackers, *or any substance having such properties that it may spontaneously, or acting under the influence of any contiguous substance, or any chemical or physical agency, ignite, or inflame or generate inflammable or explosive vapors or gases to a dangerous extent* . . ." (emphasis supplied).   The language of § 9 is sufficiently broad to encompass flammable articles which heretofore have not been brought under the department's regulations.

specifically, and the evidence (including Dr. Hankard's reports) did not justify finding them to be other unnamed substances "highly susceptible to detonation." The language of the regulations was not apt to include them. Upon an appropriate showing of the qualities of DNPT and Isopor, the regulation may be appropriately amended (see fn. 2) to cover them.

3. General Laws c. 148, § 10A, requires a permit from the head of the fire department of a town where made necessary "by rules and regulations" of the board. General Laws c. 148, § 13,[3] also requires a land use license from the local licensing authority (in this case the selectmen) for the use of a building where certain articles designated in c. 148, § 9, are being kept, stored, manufactured or sold. If the department's regulations are amended to include DNPT and Isopor as Class B hazards, it, of course, would become necessary for Frontier to obtain a permit from the fire chief under § 10A. On the other hand, if the regulations remain as they are the license from the selectmen required under § 13 would suffice.

We view c. 148 as designed to provide licensing by fire prevention authorities of substantial use of materials deemed by the department to be highly flammable. As the regulations now read, no license under § 10A is required. Any relief which we grant should afford an opportunity to the department to amend its regulations appropriately to include DNPT and Isopor, so that any protection of the public deemed necessary by the appropriate fire prevention officials may be required by them rather than leaving the matter uncertain or for decision by the courts or by selectmen, who cannot purport to be experts in the field.

4. The final decree is reversed. A new final decree is to be entered declaring, in a manner consistent with this opin-

---

[3] Section 13 provides, in part, that "[n]o building or other structure shall . . . be used for the keeping, storage, manufacture or sale of any of the articles *named in section nine,* unless the local licensing authority shall have granted a license to use the land . . ." (emphasis supplied). Unlike §§ 9, 10 and 10A of c. 148, § 13 does not refer to any regulation adopted by the board, but solely to articles mentioned in § 9 of the chapter.

ion, (a) that DNPT and Isopor are not Class B explosives within the present department regulations; (b) that, if the regulations are amended within sixty days after receipt of the rescript in the Superior Court to include these substances as Class B explosives, and a copy of the amended regulations is promptly transmitted to Frontier with a ruling by the appropriate department official that the regulations apply to Frontier, then Frontier will be bound to apply for a permit under § 10A, before resuming operation, unless it obtains a reversal of the ruling by a seasonable appeal under § 31; and (c) that, in the absence of an effective regulation within such sixty day period, Frontier may resume operations but only if it obtains a license under § 13.

This is the opinion of a majority of the court.

*So ordered.*